at 25-1104. Mr. Barnett, you are reserved three minutes, is that correct? Yes, Your Honor, it's Barrett. When you are ready, sir, you may proceed. Good morning to the Court. This appeal arrives after cross motions for summary judgment in the District of Connecticut and offers the Court the opportunity at long last to confirm that the First Amendment protects our ability to record police activity in public. And so can you tell me where that derives from? How do we understand that? Is it a right to generate speech? Is it a right to petition the government? Where is the origin of that right? Your Honor, there are six circuit cases to have decided that by the night that Mr. Massimino was arrested, located from three streams. Number one is speech formulation. You think about Bilotti, Citizens United, and cases like that. Number two is the media type. For the simple purpose, you think about Burstyn, that the First Amendment doesn't change when new forms of media come along. It rides right along. And the third, of course, is expression itself. The making of the video recording was a precursor to Mr. Massimino deciding what was in the video, how long the video would run, what the subject would be, and that. Those cases are all quite old, and as a result, this is an excellent opportunity for the Court to join the other circuits that have determined that those three streams of cases make it apparent that we have the ability to make video recordings of government activity in public. Okay, but there's two activities, right? There's the recording the activity and the recording police activity in public. Are they the same? Are they different? Is the analysis different? And I know my colleague wants to jump in. Yes, I think that they are the same, Your Honor. We do not think that the right changes with the subject matter that's within the frame of the camera, provided that the person doing the recording is lawfully present where they are recording and that there's no prohibition against the recording of what they're recording. May I ask what they were recording? Yes, Your Honor. Mr. Massimino was recording the exterior of the Waterbury Police Department. So he wasn't recording police activity like an arrest or a questioning of anyone. He was recording the premises. It so happened that no police officers came, or indeed no one at all, came in or out of the facility while he was doing this. I ask because is it clearly established that that is protected activity? I know that you have a body of law that allows you to argue that recording police activity interchanges with the public or things like that may have protected status, but what about this? I think so, Your Honor, for the reason that you can view what Mr. Massimino was doing as perhaps a narrower application of the broader right. Well, first let me ask you, has that been recognized by any case? The building itself, Your Honor? No. Well, I suppose you can read Turner from the Fifth Circuit two ways. Turner prevaricated a little bit, addressed police activity, but also said, or the police station. So you could view Turner as being on. Well, that wouldn't be controlling on us, though. Of course we'd consider it, but why would the officers not be entitled to qualified immunity in the circumstances of photographing or videoing the police station? I mean, after all, there is concern about malevolent intent with respect to people, you know, looking out, whether visually with their eyeballs or with a recorder, police buildings or certain government buildings. Why isn't this a qualified immunity case? Well, Your Honor, the narrower instance in which a person may be up to no good is amply covered by Connecticut's criminal code. So nothing about recognizing or confirming the right here would remove the ability of the police to investigate. I'm not sure I was making myself clear. If it's not clearly established that there is a constitutional right to film the police station, wouldn't the officers have qualified immunity? Yes, but it is clearly established, Your Honor, by two avenues. Number one is clear foreshadowing, and number two is obviousness. I'm not sure. I just asked you what case supported it, and you acknowledged that there is ambiguous language in a Fifth Circuit case but nothing else. Did I misunderstand you? No, Your Honor, but what you may misunderstand is the force, at least what I'm contending, is the force of the Sixth Circuits to have decided the issue before Mr. Massimino was arrested. It wouldn't square with those to say that one has a right to record the police in public except if it occurs, for example, in front of the police station. But there has to be some activity. I mean, if there's nothing going on and you're just filming the police station, that's a different circumstance, isn't it? No, Your Honor. I don't think so for First Amendment purposes. One may film the police station in order to make a point, for example, about the police budget, to perform architectural criticism, or in Mr. Massimino's case, to produce a video showing the reaction or not of the Waterbury police to him exercising his right from the start. Well, his purpose was to see if they were going to arrest him for doing it. But that's neither here nor there. I'm trying to figure out what right he has in the absence of police activity to be filming this station unless you're going to tell me you don't agree that there's a legitimate concern about malevolent intent when one is photographing government buildings that have been the subject of target attacks. Your Honor, I think that the malevolent intent concern, that goes more to the Fourth Amendment, whether or not the defendants could have approached him and investigated. But to confirm that the right exists does not say that the police are denuded of their ability to address those circumstances. All right. All right. I think I understand you. I don't want to take up all your time. Well, I'm interested in extending the conversation to figure out, if we assume that there is a right to record a police station, what are the limits? I mean, certainly if one can record the outside of the building, that is not the same thing as being able to walk into the lobby with a camera. Are we looking at a more like time, place, manners restriction? Are we looking at a buyer's restrictions? What would limit such a right under your view? Well, Your Honor, to kind of reprise what I was saying earlier, A, recognition of the right here does not necessarily address later applications of it. But to take it all the way out through your hypothetical, I think that there could be generally applicable restrictions on, let's say, the inside of the police station without offending the First Amendment provided in that. So you're asking us not just to find that you have a right to record a police building from the sidewalk. You're asking us to find that there's no restrictions on it? No, Your Honor. Okay. So time, place, manner, something else? Like, what are the restrictions? So I think in a vacuum, it's intermediate scrutiny. But in this case, because the defendants approached Mr. Massimino and couldn't have made clearer that their objection was the subject matter of what he was filming, I think that that's strict scrutiny. That is to say there's a prohibition against specifically recording the exterior of the police station. That probably has to meet strict scrutiny. The other thing to note, Your Honor, is that this was a one-off prohibition. There's no Connecticut statute barring what Mr. Massimino did. There's no Waterbury Ordinance doing that. And so there may be in the future such a prohibition that can be subject to a more regularized analysis. But in this instance, we're talking about the exterior of the police station and nothing more. Well, let's talk about that for a minute because it looks to me like the district court assumed, well, the district court repeatedly says confidential and nonpublic areas. And there's this statement of fact where I believe the defendant's statement says that the interior includes private spaces. And your response is, okay, but the exterior does not. But yet the district judge says, quote, this case involves making a videotape of nonpublic spaces. So before we get to these other questions, it looks to me like the district court made a factual finding on a disputed fact that was central to the court's analysis. I didn't see that as a focus here, but that to me causes a real problem with the analysis because the district court says, look, plaintiff's cases don't help him because they involved public spaces. And this involves, quote, a videotape of nonpublic spaces. I watched the video. I didn't see any nonpublic spaces. Yes. Your Honor, with respect to the district court, I think it made a mistake there. That is not a disputed fact. Both sides agree. It is not an undisputed fact or it's not a disputed fact. Where Mr. Massimino stood and what he recorded, those facts are not disputed between the parties and were not at summary judgment. So a finding that there was a nonpublic space recorded, neither party believes that to be true. That's right, Your Honor. So what do we do with that if we believe that that factual finding, erroneous factual finding by the district court, and we'll ask your friend on the other side if they agree, underpins the analysis and the distinction of the cases that would arguably, from your perspective, make this a clearly established right? What do we do with that? Well, Your Honor, because this Court conducts de novo analysis of the legal question of qualified immunity, I think that it's entitled to, indeed, de novo review of the cross motions as a whole. It's entitled to view the factual record in terms of what was not disputed at summary judgment. I think that the district court, I don't really know how to parse it, but I think it characterized the record in a certain way that was inaccurate, but that was bound up with its legal analysis of looking for a factual twin for purposes of qualified immunity. I don't think there's any impediment to this Court reviewing the undisputed record and concluding correctly that everyone agrees that Mr. Massimino stayed on the sidewalk and never once strayed from it. I have a question about malicious prosecution. If you want to stick with first amendment. No, I'm okay. We can move on to the Terry stop. Go ahead.  Go. Do you want to start? Well, I was going to go to malicious prosecution. So start with false arrest for Terry and we'll move on. Okay. So when do you think the Terry stop started? When the defendants approached him at close range and demanded ID. I think that was 20, if I recall correctly, 19 or 20 seconds into the party's interaction. So I think it's at 6.59 on the video recording. That's where I think it's Mr. Benoit. I can't even remember. It's been so long from the depositions. And Mr. Leon flanked Mr. Massimino very close. One said we need ID. The other repeated we need ID. That's when he was seized. Okay. I'm sorry. I didn't hear the last word. That's when it started? That's when he was seized, Your Honor. Yes. I will, of course, this Court has to know for review, but the defendants agreed in front of the district court that that was the point at which the seizure started. So up to that point, we had the parties approach, the defendants approached, they asked him what he was doing, and then they made the ID demand. It was very rapid. Okay. And why is their subjective intent irrelevant? Relevant, Your Honor? Irrelevant. Oh. Or is it relevant? Well, typically, you know, United States v. Wren teaches us that the subjective intent of the officer is irrelevant. But Michigan v. Chesternut has the footnote saying that subjective intent can come into play or can help the court in review the situation when the officer says out loud what their intent is. For example, I'm arresting you. That takes away any question about what their intent was. Here, when they approached, the defendants made clear the reason they were suspicious and they confirmed a deposition was simply because he was recording the outside of the police station. Okay. Let's say I read Chesternut differently than you do. Was it still objectively unreasonable for them to be concerned? Well, to seize him, yes, it was, Your Honor. Of course, no one's contesting that they could come up and attempt to have a consensual conversation. But the seizure was unreasonable because they had these things and these things only when they seized him. They had a man standing on the sidewalk with a camera and a tripod. They knew he was unarmed and they knew he was video recording. That is it. So they did not have to. Well, why isn't it reasonable for them to see whether he's on the malevolent or benevolent side of the line in doing that recording, much as they would if someone were photographing or videotaping a jewelry store or some other place that, you know, might be vulnerable to attack? Your Honor, of course they were free to approach and engage him in conversation. But what they were not free to do was to detain him for identification after that point. Well, asking someone for identification or to identify themselves is a pretty typical start to any conversation, isn't it? It may be, but this Court is pretty clear that along with the show of authority they made, it's a seizure. And so they began not by asking him, but by asking what he was doing. Well, a terrorist stop is a seizure. It's a temporary seizure. For purposes of deciding if there is some basis to think that illegal activity is ongoing. So they see somebody videotaping the police station, which is a site that has been generally sometimes subject of attack. So they want to know why he's photographing the spot. I mean, basically is he checking it out for some future malevolent purposes or is he doing it benevolently? Why isn't that entirely permissible? Well, it's permissible to begin that investigation with a consensual conversation. But because of the paucity of information that they had leading to reasonable articulable suspicion, that's why the seizure is infirm. For example, before oral argument. I'm suggesting to you that just the fact that these are sites that can be the subject of attack. You know, like the White House, Congress, City Hall, any of a number of sites. And someone is videotaping them. And so you go up and you ask them who they are and what they're doing. Well, Your Honor, I'm sorry to say that in 2026 it's difficult to pick out a public building, including even a school these days. That may not fit that description of subject to attack. I will notice that the defendants couldn't identify the attack that they claimed they had read about. In other words, it was in a distant state at a distant time. But now you're just subjective, which you don't want us to consider. Well, that's right, Your Honor. Objectively, you don't think that the police have the – that it's permissible to conduct a Terry stop asking someone to identify themselves and their purpose? Yes, Your Honor. Based solely on video recording in the way that Mr. Massimino was behaving, correct. They did not even think that he was armed. They knew exactly what he was doing. They needed more and they didn't have it. Okay. I've got a couple questions. One is I thought you just told my colleague that you did not think that their subjective intent mattered. But I thought you told me earlier that you read Chesternut to have it be helpful to you. So do you think – what is your view on whether or not the subjective – whether it's a subjective test or an objective test? Your Honor, it's plainly an objective test. I read Chesternut for a very narrow proposition that occasionally in resolving that question of all of the relevant circumstances, what the officer says can be useful to the court in getting to the bottom of that. I agree that it's objective. Okay, great. What I am interested in is let's say that we believe it wasn't unreasonable. And I apologize for all the double negatives. You know why I'm doing that. Students might not. Bad grammar here. But that it is unreasonable for the police officers to have not known that there was a First Amendment right to view the – to record the police station from the sidewalk. Does that then mean that it was reasonable for them to ask for ID? In other words, would the absence of a First Amendment right – Well, more specifically, like the absence or whether or not they – it was reasonable for them not to know because we don't have case law on it. So if we think it was reasonable for them to believe that there was no First Amendment right to record the station, irrespective of whether or not there is or there isn't, was it then reasonable for them to think that something might be afoot when they saw somebody doing it? No, Your Honor. Okay, tell me why. Those are all based on the – either analysis is based on the same body of facts. Even if Mr. Massimino – let's take a different factual situation. Let's say he had not been engaged in anything that was even arguably protected by the Constitution. His Fourth Amendment right would still run against unreasonable seizure. So the defendant's inability to point to any factors that – suggesting that criminality was afoot means that they didn't have reasonable articulable suspicion whether or not – You don't think the fact that he was both recording police cars and recording the police station, you don't think the fact that he was recording areas that shouldn't have been any particular interest, you don't think the fact that he was very curt when he was answering their questions pre-terrorist op, none of that is enough to have justified the terrorist op? That's right, Your Honor. Okay. You'll notice that not present in this case are the typical things that you find in a mine run reasonable suspicion case from this Court. Suspicious furtive movements, hiding – trying to hide what the person's doing, flight, high crime area, weapons bulges, none of those are present. Mr. Massimino was capable and told them exactly what he was doing, but believing correctly to be at a consensual encounter, he decided – Yes, Your Honor. He said, I'm getting footage for a story. It doesn't look, in other words, like your typical cases in which – But he couldn't answer the story. He didn't say what story. He said that I hadn't – you know, he's still working on it, so he doesn't want it, right? Yes. That's right, Your Honor. But it doesn't look like, for example, the traffic stop in which one person cannot tell the police officer – Was that a truthful answer, by the way? My impression was that he was recording in order to see whether they would arrest him. Oh, I think it was a truthful answer, Your Honor. It's a little bit outside the record because I don't think the depositions covered this, but Mr. Massimino intended to make a post-recording choice about whether or not to publish the video. I suppose he could have decided no matter the outcome. But isn't it undisputed that his primary purpose was to see if they would arrest him for video, videotaping a police station? No, Your Honor. I don't think it was arrest. It was reaction generally. So he was not looking to see whether or not he was going to be arrested and certainly didn't want to be arrested. In his testimony, I believe he said a perfect audit would be no reaction whatsoever. And the youth offenders coming and going, that's not legally significant? Well, it's significant for purposes of Cox Publishing or a case that we didn't cite, but that's kind of the end of that line, which is the Florida Star versus BJF. Here the government had marked the youth services division door in foot-high letters that are visible from the street even as of a couple of days ago on Google Street View. And so what that line of cases teaches us is that where the government has decided to disclose information, number one, we're entitled to take its analysis as conclusive, that the information is not going to harm anybody. And number two, it's— I'm sorry, what case is that? Look at the Florida Star versus BJF. That's a case in which the—I regret that we did not cite it in our brief. Oh, okay. That's why I don't know it. Yeah. So a reporter lawfully obtained the name of a complaining witness in a criminal case. The state thereafter attempted to prosecute the reporter for having done that. And the teaching of the Florida Star is that when the government voluntarily discloses information to the public, it is prohibited from using a speech restriction as a downstream method of controlling that access. Right, but that still gets us back into the—is the right to speech include the right to record? And is there something different about police stations? But I appreciate I'll take a look at the case. Yeah. Your Honor, the short answer is do not mark the door in foot-high letters if you think it's secret. So you need reasonable suspicion at the moment of a Terry staff. You need probable cause at the moment of an arrest. The court and the parties seem to sort of just stick malicious prosecution in with the arrest. And I know that we have a lot of case law in Connecticut that says it is initiating or procuring a prosecution. But this is a three-year prosecution. Do you have any—is there any argument here about—I didn't see one—about an ongoing need for probable cause? In other words, do the authorities—my recollection was that the authorities have to have sort of every time he went to court, say, 20 times. That every time he does that, they have to continue to believe that they have probable cause to prosecute him. I didn't see any independent arguments about malicious prosecution in this case. Even your header just says it's all sort of—it all runs from the Terry staff, right? Your header is you can't—you have—the defendants lacked probable cause to arrest him because the Terry staff was illegal, and therefore the malicious prosecution claim there was also no probable cause for that. So should we even be exploring probable cause at all, or does this all just go back to if the Terry staff— if we were to find the Terry staff was good, do you have any remaining argument on false arrest and malicious prosecution? I'm forced to say no, Your Honor. Okay. Because of, as you know from Goffey-Chivers, which you wrote on the district court bench, if there was a valid Terry staff, then the 53A-167A violation would have been a declination to ID. But, of course, we don't think there was one yet. But I think I found false arrest in Goffey-Chivers. No. My recollection is on one count you did not, Your Honor. That's true. On one count I did not. On the other count I did. I've locked myself into a toxic— And one was interfering, and one was DUI. But maybe I'm not remembering that trial correctly. Well, it's—I only raise it because, as the Connecticut representative here, you well know that if there was suspicion, then I think the footnote in Alloy, A-L-O-I, and the teaching of Williams from our Supreme Court mean that he had to ID himself. Okay. But, of course, we don't think there was suspicion, and so that flows from that. Okay. Thank you. Thank you, Your Honor. You're welcome, Your Honor. And can you pronounce your last name for me, sir?  It's Mangachi. Mangachi. Joseph Mangachi for the officers Benoit and Leon. Sir, and I just want to assure you in advance that we will keep you as long as we need you. So if it's—you might get more time, too. So don't stress out. Thank you very much, Your Honor. Good morning, Your Honors. Under the undisputed facts in this case, it was objectively reasonable for these defendant officers to initially approach Mr. Massimino to investigate what was their reasonable suspicions, and when he— But what was the reasonable suspicion? Was it just the act of recording? Oh, no. It was much more than that. Tell me. It was the fact that he had been recording for over six minutes as he walked around each side and the front of this particular police station. And to focus in on some of the questions asked of my colleague, this police station faces East Main Street. The record reflects all of what I'm saying here. When you go into the main entrance, there's a small lobby area that the public is allowed to enter. That is the only public space in this entire building. If one were to look at the front of the building, along the left-hand side of the building, it goes slightly downgrade, and underneath the building is where the gas pumps are and the undercover vehicles, among other police vehicles, are parked. Also along that same side on that street is the youth division entrance and exit underneath the police station as well. So what— Would you have stopped somebody who was not—or do you believe, though, that it would have been reasonable suspicion to have stopped somebody who—or to inquire if somebody was just standing there? Just standing? Yeah. No. I mean, this is all stuff that's public. But what is it then about the recording that turns this into— It's the areas of recording is what it turns it. Not the recording. But somebody eyeballing it and using that for a story. I mean, if you're concerned about your undercover cars, I'm not sure why they're out in the public. But like— Well, they're not. Okay. They're not out in the public. I thought you said that that's where they were. No. Oh, no. They're underneath the building. One would have to go underneath the building to prohibited areas in order— So what relevance does that have to this, then? I'm sorry? What relevance does that have here, then? Because I thought, too, that you were claiming that from the sidewalk you could see the undercover cars. But if you can't, then why do we care about them? No, you can see them, but they're in a different location underneath the building. But from the sidewalk you can see the undercover cars? Yes. So then my question, again, is would someone have a— would you disagree that someone would have a First Amendment activity to walk by and take a look at them and publish an article that says most of the undercover cars look like X or look like Y? What is it about— Are they just—in your example, Your Honor, are they just stating it orally or are they reflecting it with some photographic or video evidence? Okay. So I want for you to explain to me why the act of recording changes something that I think you were conceding is a First Amendment activity to convert it to something that is not. Where is the law for that? Well, it's just the opposite. There is no law to prohibit a clearly established constitutional right to allow someone to videotape those areas. That's the whole—I'm sorry, Your Honor. I thought the problem was that the concern was that they could possibly be up to mischievous or malevolent activity vis-a-vis the police station. Is that not the concern? That's correct. And they so stated that— To the extent you've got someone walking by, that's what members of the public are going to do, walk by, right? If someone were to plant themselves there for an extended period of time, would that arouse suspicion? Would that arouse suspicion? Just standing there? For 20 minutes, 25 minutes. How about six? Six minutes. I'm sorry? Six minutes. Why don't we try six? Okay. That's not my hypothetical for different reasons. Stick with me. If someone were to stand in front of the police station looking in the garage for 20 minutes, 30 minutes, would that arouse suspicion? I think it would. All right. So is the point here that the recording basically gives you an extended period of time view of the picture? Not temporally, but now you know what—you don't have to stand there for 20 minutes. You don't have to rely on your memory. You have a recording of it. Yes. Okay. And so for malevolent actors, they now know what every aspect of the station is like that they might be— And they've memorialized it. And again, to use the analogy I gave your colleague a moment ago, like someone videotaping the entrance to a jewelry store? Sure. Just like in Terry. I mean, it's the same kind of situation. The facts that these police officers had before them, leading up to them going out and approaching Mr. Massimino, clearly rose to the level of reasonable suspicion that something might be afoot. They approached him. They asked him what he was doing. He's still not seized yet. And the district court indicated in its decision that the seizure came when they indicated that their request to produce the identification was a quote-unquote lawful order. It was at that point that the district court concluded that he was seized. So at that—leading up to that point, the officers had a volume of information. Someone who is outside casing, in a sense, the building, video recording it, doing it in areas of sensitivity, and doing it for over six minutes raised a reasonable suspicion that something might be going on here. The fact also, they knew going into their initial encounter with Mr. Massimino, of other incidents involving attempts or damages being caused to police stations, police officers, Officer Leone's specific duty was with regard to security and safety of that building for all occupants. All right. So let's assume that when he was questioned, he did identify himself, produced identification, and said, I'm making a video about police activities, and I, you know, have a site that I display these on. Is that the end of the inquiry then? They indicated in their affidavits that they would have, with his identification, run an NCIC check and other checks to see whether or not there were any outstanding warrants for him or anything else popped up that would suggest that he could in some way be dangerous. And they subsequently, after putting him under arrest, did do that, found that there was nothing that would substantiate that and indicated in their affidavits he therefore would not have been arrested. Well, we don't have to deal with what they did or didn't do. My question is to ask you, are you conceding that if he had a legitimate reason, he was doing a video, doing a school project, doing whatever, then there would have been a First Amendment right to continue the activity? He clearly had a First Amendment right to videotape police activity, but that's not what he was doing. And that's the whole issue here, is that there is no clearly defined right to record, as he was recording in the areas of the police department that he was recording, a clearly established constitutional right to do so. Even in Turner, the Fifth Circuit case, the ultimate holding in that case was there were, because up to that point, the Fifth Circuit hadn't even recognized that there was a right to survey police performing their activity. So they said in that case, it wasn't clearly established at that point, so the officers had qualified immunity. But going forward, the Fifth Circuit said, yes, there is a First Amendment right to view, videotape, record police performing their activity. Even in Turner, they never said that there was any kind of right to record a police station, number one, or to record sensitive areas of a police station. Never got to that issue. It just happened to be that the plaintiff in that particular case happened to be recording police activity in the area of the police station. So the police station was part of it. I want to pursue with you how much of this has to do with the fact that it's a police station. If someone were to call the police department and say, there's a fellow outside my home videotaping it, can the police come and conduct a Terry stop to ask what the person is doing videotaping a private residence? I would say yes, Your Honor, because what they're videotaping is private property. Just like they wouldn't have a right to go into that person. If we're talking about someone's home and someone's standing outside their home and they're videotaping the inside parts of that home, they're trespassing. Well, even the outside. Or the outside. Well, and then they show up and the person says, I'm an architecture student and I find this building very interesting. Is that the end of that matter? If there's no other facts to suggest that something may be going afoot, so to speak, as Terry calls for, I'd say yes. Okay. So I'm hoping you can help me explain how any of the things that Mr. Massimino recorded were stuff that would have been available to anybody had they just been walking down the street or they had been standing on the sidewalk for six or so minutes. Can you articulate for me why is the act of recording, what makes it sensitive or not sensitive? Well, what makes it sensitive is the fact that in the context of all that's going on, the level of suspicion and the level of safety concern is heightened when someone has it on a video that they can now walk away and look at. Okay. So what I think you're saying, I just want to make sure, it would seem to me that the sensitive areas wouldn't be context specific, right? Whether or not it was reasonable to put limits on recording or observing might be context specific, but is it actually true that we decide that something is sensitive or not sensitive based on the observer and the manner in which it's being observed? Is that something we can doctrinally manage? I think it's very fact specific to whether or not... Whether or not something is a sensitive area... Is a sensitive area, yeah, sure, sure. But you're asking us to say that it's fact specific after the fact, right? Like you can't say right now that a particular building is sensitive or not sensitive and then have it be completely exposed to somebody that is walking, right? I mean, it seems to me there's something more. There's something different that's happening. If an area is sensitive, then it's sensitive because it's sensitive. Is that right? It's true. I mean, someone simply looking, just passing by a public street and glancing into the area where the gas tanks are and the undercover cars are is fairly inconspicuous. But being out there for six minutes and continuing to record all types of things, including that area, does raise one's level. And I'm asking for doctrinally why and where. Where does it become a sensitive area that is viewable by the public for anybody who's walking? I mean, you're not going to—some people have photographic memories. Some people may walk by it six times. Why does the act of recording it make it so significant, as such a significant fact in this inquiry? I think from the perspective of the fact that whatever's been seen has now been memorialized and therefore can be looked at over and over and over again. Let's assume that this was leading up to some sort of a plot to do damage to the police department. Now they not only don't have—if it wasn't recorded, they have their visual memory of it. Now they have a recording that they can— So we have someone that has a perfect memory. Yeah, as opposed to that. No, what I'm saying is if we have somebody that's a perfect— So you have someone that has a perfect memory, but they don't— Or someone that has to walk by it every day to get to work. Yeah. Does that make a difference? I think it does, because I think when you're recording it— But how is that more workable than what you have just decided to share with the public by being on the sidewalk? I mean, you're basically saying—or at least what I'm understanding, and I don't— I'm hoping you can help me grapple with it, is that somebody that has a perfect memory doesn't have— or has the—it becomes reasonable for them to come in and stop them, but somebody who's just walking by doesn't. Someone who has to walk every day on their way to work and who can notice different details over time or confirm their memory will have a different—it will suddenly become reasonable to stop them. I'm not sure that that's workable. Like, how much of this—well, tell me why that would be workable. Well, again, I think it—you know, so much in these situations is fact-specific. And someone just—I mean, if the example is someone just happens to be walking by that area, and as they're walking by, they look into the area where the gas tanks and the police cars are, and they keep on going, that's one thing. But if someone's out there for over six minutes going all around the building and video recording it, that raises a reasonable suspicion in the minds of the police officers who've been viewing this for over six minutes. But what about the person who has to walk by it every day to get to work, to get to school? Well, Your Honor, if a person walks by it every day and glances in there and the officers were to approach that person, I would say they had no right to approach that person. Notwithstanding the fact that over time they could confirm any of their information. The officers have no other information that is reasonable, in my opinion, to make a Terry stop. Simply walking by the police station isn't, in and of itself, some suggestion of their criminal activity may be afoot. But when you take the— But isn't there something odd about the idea that a building has more— that under how I understand your position to be, that a building has more protections against First Amendment intrusions than a person? Person or property, Your Honor. I mean, yeah, there could certainly be those situations. Because you're conceding that police activity via law enforcement officers could be recorded. You've conceded that. So now we're saying that the building gets more privacy than the officers do. Is there something doctrinally unreasonable about that? I think it depends on the building. I mean, if someone were outside of this building doing a similar type thing, I think that's a lot different than if they were doing it, you know, at some other building that didn't involve judiciary, law enforcement, political leaders. So you just told my colleague that homes would be—that if somebody was videotaping a home, it would be reasonable to— No, not if they're videotaping a home. If the videotape is directed inside the home, and they're recording things inside the exterior of the home. Okay, but you're not suggesting he had a high-powered camera and was actually going inside the building. He was recording what was visible from the sidewalk. All we know is that what the officers observed was him recording these areas for over six minutes. The officers at that point did not know what was actually captured on the video, but it's certainly reasonable to infer if someone comes with a tripod and sets it up and is out there canvassing the building for over six minutes, that it's likely what they're moving the camera to is being recorded by the camera. Okay, so you think the recording alone was what provided the reasonable suspicion for the terrorist attack. No, not the recording alone. No, no. The totality of what they saw, the time that— Okay, but it has nothing to do with the denial of ID. No. Oh, no, no, no. The denial of your ID goes to the question of whether he should be arrested for interfering with a police officer. That's a whole other issue. But qualified immunity, at the end of the day, deals with every claim that the plaintiff's made in this case. Because if qualified immunity applies, then on any and all of the claims asserted by the plaintiff, the defendants are entitled to qualified immunity. Well, that's not so, is it? I mean, the first question is whether they may have qualified immunity in thinking that there was or was not a First Amendment right to videotape. Whether or not they thought there was a Fourth Amendment right that they were violating by stopping him is another question. And then whether they had probable cause under the Fourth Amendment is yet another question. And each of those would have to be considered separately, no? Well, yes, in this respect. Clearly, the trial court's decision with regard to the First Amendment claim was based on qualified immunity alone. When it came to the claim of reasonable suspicion in the Terry stop, the court concluded that there was sufficient... Well, I understand what you're saying. If we disagree with the qualified immunity analysis, then you have more problems at the Fourth Amendment stage. Well, I still don't think I would have problems, Your Honor. I think that there was clearly reasonable suspicion to conduct the Terry stop, and they did so in an appropriate way. That's separate from qualified immunity? It is. Okay. I'm sorry. No, what I was saying is overreaching all three claims. At the end of the day, if qualified immunity would apply in the First Amendment context, it would likely apply in the context of the Fourth Amendment as well. Can I ask what we do with Friend v. Gasparino? We have a Connecticut statute that doesn't cover refusals to comply with unlawful orders. So if we think the Terry stop was illegal, does that mean that there was no probable cause? If the Terry stop were illegal, there was no...  If you didn't have the right kind of suspicion to do the Terry stop, does that mean you didn't have probable cause for the false arrest and malicious prosecution claims? Or as to the false arrest and the malicious prosecution claims? Well, as to the... So Your Honor's question is if the Terry stop... Well, I'm more asking what we should do with the Friend v. Gasparino case, and I'm trying to tease that out. My understanding is that the Connecticut statute that you are citing doesn't cover refusals to comply with unlawful orders. That's correct. Okay, so if we thought that the Terry stop was illegal, which I'm not saying we do, but if we thought that it was, does that mean that you had no probable cause, that there was no probable cause? Well, I think we would still have probable cause. The question is whether or not you still... You have to meet as a predicate the fact that you had a valid Terry stop before you could get into the issue of probable cause, because the probable cause here was a refusal to give the identification, which is clearly covered under the criminal statute. Right, but if it was unlawful to ask for it because... If the hypothetical is that it was unlawful to ask for it because you didn't have reasonable suspicion, then is there... Did you have probable cause for some other reason? I'm not quite sure, Your Honor. I'm just not. I'm sorry. Because it depends on that statute. I mean, obviously, if he asked someone for identification and he slugged him, that might be a different situation where probable cause for assaulting the police officer existed, regardless of whether the police officer had grounds for the stop. But where here you're saying that the arrest is for not giving identification, the statute suggests it's only in the face of a lawful order, right?  So that's a difference. Yes. Yeah, okay. And I would point out, and I think Judge Merriam raised this point earlier with regard to continued probable cause, the record reflects, and we had raised at the trial level, the issue that Mr. Massimino had already had by his motion a determination that probable cause for his arrest existed in this particular case, and the Court denied our collateral estoppel argument on the basis that because he ultimately had the charges dismissed and it was not... He did not have the ability to appeal that decision. It couldn't be used against him. But the Court, at the trial level, on one if not two instances, specifically referenced the fact that in the criminal proceedings, probable cause was found after a hearing at Mr. Massimino's request. If you have any other questions, I'd be happy to... Thank you very much. Thank you very much, Your Honor. Thank you. And Mr. Barnett, I'm going to keep you to the three minutes because your clients, your respective clients got their money's worth. Thank you, Your Honor. So I suppose I just want to note three things in the context, all under the same heading, which is how clean this record is and how few disputes there are. So the defendants agreed at deposition and did not dispute at the district court that their sole probable cause for an arrest lay in the 53A-167A violation. That's that. They also agreed at deposition with me when I asked them whether their suspicion was based on anything other than the video recording. They said no. That was their sole suspicion. Now, they characterized it as the subject of the video recording, but that was it. The last thing I want to raise is that I think that, Judge Perez, you're quite right. The First Amendment right cannot depend in retrospect upon the government's characterization of the information. Once the government puts the information out into the public, it is stopped. It's prohibited from using a speech-based restriction to control dissemination of this information. I think the last case, your question takes us into an area that we didn't quite brief, but the last word on this from the U.S. Supreme Court is Bartnicki. That's Bartnicki v. Vopper. Before that was Florida Star. And the answer is if the information is obtained lawfully, then the government may not impose a speech restriction to control that which it wished it had controlled earlier. Lastly, my opponent raises the idea of what I will call dwell time, that there was a period in which a recording or the taking of the recording gives the person the opportunity to study and restudy the exterior of the police station. Judge Perez provided a kind of counter example of a person who walks by all the time. But in 2026, the elephant in the room are the mapping applications. A person could more easily, and not having a criminal mind myself, I think might more safely, if they were up to no good, just look at Google Street View. You can see all of this stuff. I want to take you back to your speech point. How do they know he's engaging in speech until they ask him? Well, the fiction of qualified immunity is that they're aware of all of the case law that comes down. And so they ought to have known that he was engaged in speech formulation, the same as if, for example, he had pulled out a sketch. So everybody who's videotaping anything is in the process of exercising a First Amendment right? Yes. What case says that? Well, I think the outer limit is Gibney v. Empire, Ice, and Storage. So unless the police can demonstrate or have suspicion that the person's speech act is intertwined with non-speech act that is aimed at accomplishing a criminal end, by the way, that would make it speech integral to crime, and it would fall through a First Amendment trap door. Then it's pure speech. Well, see, I'm going to suggest to you that someone videotaping police station, private building, whatever, could be engaged in speech activity because he's going to post it on a video or make a school project or whatever. But he might not be. And so why isn't it – and when might not be, he might be actually involved in electronically casing the joint, so to speak. Why isn't it reasonable for them to ensure that it's the former and not the latter? And if the former, of course, allow it to continue. But if the latter, take appropriate law enforcement action. Well, Judge Radley, I have a hard red light in front of me, so may I have your permission to answer? I'm sorry, I didn't hear you. I have a red light in front of me, which Judge Perez has warned me. He does, of course. Thank you, Your Honor. So I think that in that instance, the Fourth Amendment, it kind of has an interplay with the first. I think you're right. Of course, the police are always free to approach and to make, through consensual conversation, determine whether or not they have reasonable articulable suspicion. Nothing in this case requires this Court to decide that the simple act of what appears to be pure speech automatically puts a consensual investigation off limits. They certainly can do that. The error, the legal error here of the defendants, was that they made an immediate seizure based solely on pure speech. Well, I'm not sure I understand how we would distinguish a consensual inquiry from the police coming up and asking you questions. I mean, haven't we generally viewed that as a Terry stop? Most people stopped by the police figure that, you know, they can't exactly walk away. Yes. Your Honor, it's a little bit context dependent, but here it was the close approach and the ID demand. I think within 19 seconds of asking the first question, I think the ID demand might have been the third question they got out. So they were free to ask, you know. But you think when activity can be lawful or can be a prelude to illegal activity, that that's not enough to justify a Terry stop? Well, there's got to be more facts showing that prelude that you allude to. Well, I'm suggesting to you that we have a building that can be a target building, and that electronically recording rather than just visually seeing it, making a record of the entrances, the exits, et cetera, is what makes one suspicious. Standing alone, no, Your Honor, for a couple of good reasons. One is that the rule that you propose would apply to virtually every government building. It would destroy the First Amendment right to gather information, which we know we have from Hutchins and from Brandsburg. Well, not necessarily. I mean, if the answer at the Terry stop shows legitimate activity, that would be the end of the matter, wouldn't it? Well, no, Your Honor. So Mr. Massimino and everyone else has a Fourth Amendment right kind of the opposite way, that the burden is on the government to develop those facts before effecting the seizure. So you say the Fourth Amendment is violated when you ask someone, what are you doing here? And they're not free to leave until they answer that question. That's the Fourth Amendment violation. Yes, Your Honor, if they're not free to leave. I just want to be sure I understand your position. Thank you. Thank you. This was very helpfully argued. I appreciate it. Thank you very much.